## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARIA STAPLETON, JUDITH LUKAS, SHARON ROBERTS AND ANTOINE FOX ON BEHALF OF THEMSELVES, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, AND ON BEHALF OF THE ADVOCATE PLAN, | Civil Action No. 1:14-cv-01873 |
| Plaintiffs, | |
| v. | |
| ADVOCATE HEALTH CARE NETWORK AND SUBSIDIARIES, *et al.*, | |
| Defendants. | |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

KELLER ROHRBACK L.L.P.
  Lynn L. Sarko
  lsarko@kellerrohrback.com
  Erin M. Riley
  eriley@kellerrohrback.com
  1201 Third Avenue, Suite 3200
  Seattle, WA 98101
  Tel.: (206) 623-1900 / Fax: (206) 623-3384

COHEN MILSTEIN SELLERS & TOLL, PLLC
  Karen L. Handorf
  khandorf@cohenmilstein.com
  Michelle Yau
  myau@cohenmilstein.com
  Mary Bortscheller
  mbortscheller@cohenmilstein.com
  1100 New York Avenue, N.W.
  Suite 500, West Tower
  Washington, D.C. 20005
  Tel.: (202 ) 408-4600 / Fax: (202) 408-4699

KELLER ROHRBACK L.L.P.
  Ron Kilgard
  rkilgard@kellerrohrback.com
  3101 North Central Avenue, Suite 1400
  Phoenix, AZ 85012
  Tel.: (602) 248-0088 / Fax: (602) 248-2822

STEPHAN ZOURAS, LLP
  Ryan F. Stephan
  rstephan@stephanzouras.com
  James B. Zouras
  jzouras@stephanzouras.com
  205 North Michigan Avenue, Suite 2560
  Chicago, IL 60601
  Tel.: (312) 233-1550 / Fax: (312) 233-1560

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

I.    OVERVIEW ............................................................................................................ 1

II.   THE ALLEGATIONS OF THE COMPLAINT ............................................... 3

III.  LEGAL STANDARD ......................................................................................... 4

IV.   ARGUMENT ...................................................................................................... 5

    A.    Defendants' Reading of ERISA Removes any Church from the Exemption. ...................................................................................................... 5

    B.    The Statutory Text Makes Clear That Only a Church May Establish a Church Plan. ....................................................................................................... 6

    C.    ERISA Section 3(33)(C) Does Not Alter this Conclusion. ................................ 7

        1.    The Provision Regarding Who May *Maintain* a Church Plan Does Not Change Who Must *Establish* a Church Plan. ......................... 7

        2.    The Provisions Regarding Who May Be *Included* in a Church Plan Do Not Change Who Must *Establish* a Church Plan. .................... 11

        3.    Contrary Judicial Decisions Are Neither Controlling Nor Persuasive. ......................................................................................... 13

        4.    The Private Letter Rulings Are Neither Controlling Nor Persuasive. ......................................................................................... 16

        5.    The Canon of Constitutional Avoidance Supports this Construction. ..................................................................................... 17

    D.    Even if Some Non-Church Entities Can Establish a Church Plan, Advocate Cannot. .......................................................................................... 18

        1.    Defendants Improperly Ask This Court To Review Extrinsic Documents. ........................................................................................ 18

        2.    No Church "Controls" Advocate ........................................................ 21

        3.    Advocate Is Not "Associated With" Any Church Within The Meaning Of ERISA. ......................................................................... 22

        4.    The First Amendment Does Not Entitle Advocate To Unilaterally Claim An Exemption From Federal Law Free From Any Scrutiny. ............................................................................ 24

E.      The Church Plan Exemption Does Not Apply For The Additional Reason That The Plan Is Not Maintained By Either A Church Or A Qualified Church-Associated Organization. ..................................................... 25

F.      Plaintiffs Have Adequately Pled a Constitutional Claim. ................................. 26

    1.      Plaintiffs Have Standing to Pursue their Constitutional Claim. ............. 26

    2.      Plaintiffs Have Adequately Pled the Merits of their Constitutional Claim. ........................................................................... 28

V.      CONCLUSION ....................................................................................................... 30

## TABLE OF AUTHORITIES

<u>Cases</u>

*Alaska Dep't of Envtl. Conservation v. EPA,*
    540 U.S. 461 (2004) ............................................................................ 16

*Anderson v. UNUM Provident Corp.,*
    369 F.3d 1257 (11th Cir. 2004) ........................................................... 25

*Anwar v. Fairfield Greenwich Ltd.,*
    728 F. Supp. 2d 354 (S.D.N.Y. 2010) ................................................. 13

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .............................................................................. 5

*Bankers Life & Cas. Co. v. United States,*
    142 F.3d 973 (7th Cir.1998) ................................................................ 17

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .............................................................................. 5

*Bennett v. Spear,*
    520 U.S. 154 (1997) .............................................................................. 9

*Burgess v. United States,*
    553 U.S. 124 (2008) .............................................................................. 6

*Chavies v. Catholic Health East,*
    No. 13-1645 (E.D. Pa. Mar. 28, 2014) ................................................. 2

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ............................................................................ 16

*Christensen v. Harris Cnty.,*
    529 U.S. 576 (2000) ............................................................................ 16

*Christopher v. SmithKline Beecham Corp.,*
    132 S. Ct. 2156 (2012) ........................................................................ 17

*Chronister v. Baptist Health,*
    442 F.3d 648 (8th Cir. 2006) ......................................................... 23, 24

*Clark v. Martinez,*
    543 U.S. 371 (2005) ............................................................................ 18

*Colby v. J.C. Penney Co.,*
    811 F.2d 1119 (7th Cir. 1987) ............................................................ 14

*Coleman v. Pikeville United Methodist Hosp., Inc.,*
    2008 WL 819038 (E.D. Ky. Mar 25, 2008) ........................................ 23

*Cottage Sav. Ass'n v. C.I.R.*,
  499 U.S. 554 (1991) ................................................................. 16

*Crowell v. Benson*,
  285 U.S. 22 (1932) .................................................................... 18

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005) .................................................................. 29

*Daft v. Advest, Inc.*,
  658 F.3d 583 (6th Cir. 2011)...................................................... 5

*Dixon v. United States*,
  381 U.S. 68 (1965) .................................................................... 17

*Donovan v. Dillingham*,
  688 F.2d 1367 (11th Cir. 1982)................................................. 11

*Estate of Thornton v. Caldor, Inc.*,
  472 U.S. 703 (1985) .................................................................. 29

*Freedom From Religion Found., Inc. v. Lew*,
  983 F. Supp. 2d 1051 (W.D. Wis. 2013) ................................... 28

*Friend v. Ancilla Sys. Inc.*,
  68 F. Supp. 2d 969 (N.D. Ill. 1999)....................................... 2, 14

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.*,
  128 F.3d 1074 (7th Cir. 1997)................................................... 19

*George v. Kraft Foods Global, Inc.*,
  674 F. Supp. 2d 1031 (N.D. Ill. 2009) ...................................... 19

*Hall v. USAble Life*,
  774 F. Supp. 2d 953 (E.D. Ark. 2011)....................................... 23

*Harris v. Mex. Spec. Foods, Inc.*,
  564 F.3d 1301 (11th Cir. 2009) ................................................. 29

*Health Cost Control v. Fuxan*,
  1997 WL 725440 (E.D. La. Nov. 17, 1997) .............................. 23

*Hennessy v. Penril Datacomm Networks, Inc.*,
  69 F.3d 1344 (7th Cir. 1995)..................................................... 20

*Hightower v. Tex. Hosp. Ass'n*,
  65 F.3d 443 (5th Cir. 1995)....................................................... 25

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
  132 S. Ct. 694 (2012)........................................................... 24, 29

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,*
   510 U.S. 86 (1993) ........................................................................................... 6

*Johnson v. Allsteel, Inc.,*
   259 F.3d 885 (7th Cir. 2001) ......................................................................... 27

*Jones v. City of Cincinnati,*
   521 F.3d 555 (6th Cir. 2008) ......................................................................... 19

*Jones v. Corus Bankshares, Inc.,*
   701 F. Supp. 2d 1014 (N.D. Ill. 2010) .......................................................... 19

*Kaplan v. Saint Peter's Healthcare Sys.,*
   2014 WL 1284854 (D.N.J. Mar. 31, 2014) ............................................ passim

*Kuttner v. Zaruba,*
   2011 WL 691868 (N.D. Ill. Feb. 22, 2011) ..................................................... 5

*Leeson v. Transamerica Disability Income Plan,*
   671 F.3d 969 (9th Cir. 2012) ........................................................................... 5

*Lemon v. Kurtzman,*
   403 U.S. 602 (1971) ....................................................................................... 29

*Lockheed Corp. v. Spink,*
   517 U.S. 882 (1996) ......................................................................................... 5

*Lown v. Cont'l Cas. Co.,*
   238 F.3d 543 (4th Cir. 2001) ......................................................................... 23

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ...........................................................................26, 27, 28

*MacDonald v. Grace Church Seattle,*
   457 F.3d 1079 (9th Cir. 2006) ....................................................................... 29

*Medina v. Catholic Health Initiatives,*
   2014 WL 3408690 (D. Colo. July 9, 2014) ............................................ passim

*Mile-O-Mo Fishing Club, Inc. v. Noble,*
   210 N.E.2d 12 (Ill. App. Ct. 1965) ............................................................... 22

*N.L.R.B. v. Catholic Bishop,*
   440 U.S. 490 (1979) ....................................................................................... 24

*Overall v. Ascension,*
   2014 WL 2448492 (E.D. Mich. May 13, 2014) ..................................... 2, 3, 14

*Pisciotta v. Old Nat'l Bancorp,*
   499 F.3d 629 (7th Cir. 2007) ......................................................................... 27

*Polk v. Dubuis Health Sys.*,
   2007 WL 2890262 (W.D. La. Sept. 28, 2007) ................................................................. 23

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
   393 U.S. 440 (1969) ......................................................................................................... 24

*Raines v. Byrd*,
   521 U.S. 811 (1997) ......................................................................................................... 26

*Rollins v. Dignity Health*,
   --- F. Supp. 2d ----, 2013 WL 6512682, (N.D. Cal. Dec. 12, 2013) .......................... passim

*Rollins v. Dignity Health*,
   --- F.Supp. 2d ----, 2014 WL 3613096 (N.D. Cal. July 22, 2014) ............................. passim

*Santa Fe Indep. Sch. Dist. v. Doe*,
   530 U.S. 290 (2000) ......................................................................................................... 28

*Scanlan v. Eisenberg*,
   669 F.3d 838 (7th Cir. 2012) ............................................................................................ 27

*Serbian E. Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976) ......................................................................................................... 24

*Shlensky v. S. Parkway Bldg. Corp.*,
   166 N.E.2d 793 (Ill. 1960) ............................................................................................... 22

*Sipma v. Mass. Cas. Ins. Co.*,
   256 F.3d 1006 (10th Cir. 2001) ........................................................................................ 11

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ......................................................................................................... 16

*Swanson v. Citibank, N.A.*,
   614 F.3d 400 (7th Cir. 2010) .............................................................................................. 5

*Sylvester v. Providence Healthcare Risk Man.*,
   2005 WL 3940177 (S.D. W. Va. Oct. 27, 2005) ............................................................ 18

*Tex. Monthly, Inc. v. Bullock*,
   489 U.S. 1 (1989) ..................................................................................................... 28, 29

*Thorkelson v. Publ'g House of Evangelical Lutheran Church*,
   764 F. Supp. 2d 1119 (D. Minn. 2011) ............................................................................ 14

*Thornton v. Graphic Commc'ns Conference*,
   566 F.3d 597 (6th Cir. 2009) ............................................................................................ 17

*Torres v. Bella Vista Hosp., Inc.*,
   523 F. Supp. 2d 123 (D.P.R. 2007) .................................................................................. 18

*Tupper v. United States*,
    134 F.3d 444 (1st Cir. 1998) ........................................................................................ 17

*United States v. Articles of Drug Consisting of 203 Paper Bags*,
    818 F.2d 569 (7th Cir. 1987)........................................................................................... 2

*Welsh v. Ascension Health*,
    2009 WL 1444431 (N.D. Fla. May 21, 2009)............................................................... 17

*Welsh v. Boy Scouts of Am.*,
    993 F.2d 1267 (7th Cir. 1993)......................................................................................... 9

## **Statutes**

26 U.S.C. § 401(a) (2014)................................................................................................. 11

26 U.S.C. § 501(r) (2010) ................................................................................................ 24

42 U.S.C. § 1395dd, *et seq.* (2011) ................................................................................ 24

Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001 ............ 1, 12

ERISA § 3(2), 29 U.S.C. § 1002(2) ................................................................................. 11

ERISA § 3(33)(A), 29 U.S.C. § 1002(33)(A).................................................................. passim

ERISA § 3(33)(C)(i), 29 U.S.C. § 1002 § 3(33)(C)(i) ..................................................... passim

ERISA § 3(33)(C)(ii), 29 U.S.C. § 1002 § 3(33)(C)(ii) ...................................................7, 11, 12

ERISA § 3(33)(C)(iii), 29 U.S.C. § 1002 § 3(33)(C)(iii) ............................................... 11, 12

ERISA § 3(33)(C)(iv), 29 U.S.C. § 1002 § 3(33)(C)(iv) ................................................ 23

ERISA § 3(33)(C), 29 U.S.C. § 1002 § 3(33)(C) ........................................................... passim

ERISA § 3(33), 29 U.S.C. § 1002(33) ............................................................................ 6

ERISA § 302, 29 U.S.C. § 1082 ...................................................................................... 6

ERISA § 4(b)(2), 29 U.S.C. § 1003(b)(2) ....................................................................... 1

ERISA § 4021(b)(3), 29 U.S.C. § 1321(b)(3)................................................................... 1

ERISA § 403, 29 U.S.C. § 1103 ...................................................................................... 28

## Rules

Fed R. Civ. P. 12(b)(6) ........................................................................... 4, 5, 19

Fed. R. Civ. P. 12(b)(1) ................................................................................. 5

Fed. R. Civ. P. 12(d) .................................................................................... 19

Fed. R. Civ. P. 56 ........................................................................................ 19

Fed. R. Evid. 201(b) .................................................................................... 19

Fed. R. Evid. 201(b)(2) ................................................................................ 20

## Regulations

12 C.F.R. § 701 (2013) ................................................................................ 23

26 C.F.R. § 1.401-1(a)(2) (2014) ................................................................. 11

26 C.F.R. § 1.401-1(b) (2014) ..................................................................... 11

29 C.F.R. § 2509.08-1 (2008) ...................................................................... 30

## Other Authorities

124 Cong. Rec. 12,107 (1978) ................................................................ 12, 13

124 Cong. Rec. 16,523 (1978) ...................................................................... 13

125 Cong. Rec. 10,055 (1979) ...................................................................... 13

126 Cong. Rec. 19,599 (1980) ................................................................. 12, 16

126 Cong. Rec. 20,208 (1980) ...................................................................... 13

126 Cong. Rec. 20,245 (1980) ...................................................................... 10

DOL Technical Release 2013-04 (Sept 18, 2013) ....................................... 30

H.R. Rep. No. 93-1280 (1974) ...................................................................... 12

IRS Gen. Couns. Mem. 39,007 (July 1, 1983) ............................................ 16

IRS Rev. Ruling 2013-17 .............................................................................. 30

John H. Langbein *et al.*, *Pension and Employee Benefit Law* (5th ed. 2010) ............................ 5

Norman Stein, *An Article of Faith: The Gratuity Theory of Pensions and Faux Church Plans* (ABA Summer 2014) .................................................................................. 3

Pub. L. No. 93-406, § 3(33), 88 Stat. 829 (1974) ................................................................... 10

S. Rep. No. 93-127 (1973) ........................................................................................................ 6

Senate Committee on Finance, Executive Session Minutes, June 12, 1980 .............................. 10

Senate Labor and Human Resources Comm. Report on H.R. 3904, Aug. 15, 1980 ................. 10

Webster's Third New International Dictionary of the English Language (1986) ...................... 23

## I. OVERVIEW

This case is one of several cases now pending in federal courts involving an important issue of federal pension law: the requirements for "church plans."[1] Church plans are exempt from the otherwise comprehensive federal regulation of pension plans, as set out in the Employee Retirement Income Security Act of 1974 ("ERISA").[2] This case concerns Defendants' failure to comply with ERISA based on the erroneous claim that the pension plan (the "Plan") sponsored by Advocate Health Care Network ("Advocate"), a non-church hospital conglomerate, qualifies as a church plan.

The church plan exemption is a narrow exemption for *churches*, entities Congress trusted would ultimately pay promised retirement benefits. However, over the years various large hospital chains like Advocate—which are not churches but merely claim affiliation with churches—have attempted to treat their plans as church plans. This saves them a considerable amount of money, as church plans are not bound by ERISA's vesting and funding requirements and do not have to pay premiums to the federal agency that provides pension insurance, the Pension Benefit Guarantee Corporation ("PBGC") (the PBGC guarantees pension benefits much as the FDIC guarantees bank deposits). But it also strips plan participants of all the protections of ERISA, leaving them in essentially pre-ERISA, unregulated private plans. And unlike actual church plans, no church established the plans and no church accepts responsibility for the fate of participants' retirement benefits.

Because the Plan fails to satisfy the statutory requirements for a "church plan," it is not exempt from ERISA and Plaintiffs and other Plan participants are entitled to the protections of ERISA (including minimum vesting and funding requirements and federal pension insurance).

---

[1] The other cases are: *Medina v. Catholic Health Initiatives*, No. 13-01249 (D. Colo.); *Rollins v. Dignity Health*, No. 13-1450 (N.D. Cal.); *Kaplan v. Saint Peter's Healthcare Sys.*, No. 13-2941 (D.N.J.); *Chavies v. Catholic Health East*, No. 13-1645 (E.D. Pa); *Owens v. St. Anthony Medical Ctr., Inc.*, No. 14-4068 (N.D. Ill.); *Overall v. Ascension Health*, No. 14-1735 (E.D. Mich.); *Lann v. Trinity Health Corp.*, No. 14-2237 (D. Md.).

[2] Plaintiffs omit the parallel citation to Title 29 of the United States Code in this brief, though they are listed in the Table of Authorities. Church plans are exempt from Title I of ERISA, which provides for substantive regulation of vesting, funding, reporting, fiduciary practices, and other matters, ERISA § 4(b)(2), and from Title IV of ERISA, which provides for pension insurance. ERISA § 4021(b)(3).

Fundamentally, the Plan is not a church plan because the plain text of the statute—as supported by its legislative history—requires that a church plan be *established by a church*,[3] *see* ERISA § 3(33)(A), and Defendants do not dispute that the Plan was not established by a church. *See* Mem. in Supp. Defs' Mot. to Dismiss ("MTD") at 12-18, ECF No. 35. For this reason, three of the four federal courts that have recently interpreted the church plan exemption found that plans established by nonprofit healthcare conglomerates like Advocate are not church plans:[4]

- *Rollins v. Dignity Health* ("*Dignity*"), --- F. Supp. 2d ----, 2013 WL 6512682, at *7 (N.D. Cal. Dec. 12, 2013) (attached as Ex. 1): "a church plan must still be established by a church";
- *Kaplan v. Saint Peter's Healthcare Sys.* ("*St. Peter's*"), 2014 WL 1284854, at *5 (D.N.J. Mar. 31, 2014) (attached as Ex. 2): "if a church does not establish the plan, the inquiry ends there"; and
- *Medina v. Catholic Health Initiatives* ("*CHI*"), 2014 WL 3408690, at *10 (D. Colo. July 9, 2014) (attached as Ex. 3): "a church plan must be established by a church."[5]

Defendants make *no* attempt to respond to the thorough statutory analysis contained in these opinions, relying only on their puzzling assertion that the Court is somehow bound by a single, district court opinion that did not even address the issue of whether a church plan needs to be established by a church. MTD at 17 (citing *Friend v. Ancilla Sys. Inc.*, 68 F. Supp. 2d 969, 972 (N.D. Ill. 1999)). *Contra United States v. Articles of Drug Consisting of 203 Paper Bags*, 818 F.2d 569, 572 (7th Cir. 1987) ("A single district court decision . . . has little precedential effect. It is not binding . . . on other district judges in the same district.").

Instead, Defendants cite the one recent case that has reached a contrary conclusion, *Overall v. Ascension* ("*Ascension*"), 2014 WL 2448492 (E.D. Mich. May 13, 2014). In *Ascension*, which is now on appeal, the court concluded that certain non-church entities, including the hospital conglomerate there at issue, could establish a church plan. However, the *Ascension* court—like a number of earlier district court opinions—made a number of critical errors in its analysis,

---

[3] The statute also provides that church plans may be established by a "church or by a convention or association of churches." For simplicity, Plaintiffs refer only to the term "church."

[4] A fifth federal court has considered the issue and has ordered further discovery on whether the plan at issue was established by a church. Order, *Chavies v. Catholic Health East*, No. 13-1645 (E.D. Pa. Mar. 28, 2014) ECF No. 67. Implicit in the court's denial of defendants' motion to dismiss is the plain requirement in the statute that only a church may establish a church plan.

[5] In *CHI*, the magistrate judge's recommendation is now under consideration by the district court judge.

including conducting only a conclusory review of the statutory text, misreading the legislative history, improperly deferring to informal, non-binding Internal Revenue Service ("IRS") Private Letter Rulings, and perpetuating the errors of earlier judicial opinions without any meaningful analysis. Notably, in *CHI*, the only case decided after *Ascension*, the court reviewed the law at some length, including the *Dignity*, *St. Peter's*, and *Ascension* opinions, and concluded that *Ascension* was incorrectly decided. *CHI*, 2014 WL 3408690, at *8. Similarly, earlier this month Judge Henderson reaffirmed his decision in *Dignity*, notwithstanding defendants' submission of the *Ascension* opinion as supplemental authority, noting that the court "sees no reason to depart from its earlier ruling." *Rollins v. Dignity Health* ("*Dignity II*"), --- F.Supp. 2d ----, 2014 WL 3613096, at *6 (N.D. Cal. July 22, 2014) (attached as Ex. 4). And the only scholarly commentary on these recent cases, by Norman Stein, a well-known ERISA academic, reaches the same conclusion: only a church can establish a church plan. Norman Stein, *An Article of Faith: The Gratuity Theory of Pensions and Faux Church Plans* (ABA Summer 2014) (attached as Ex. 5).

Thus, because the Plan was not established by a church, it cannot be a church plan as a matter of law. If the Court decides this threshold issue consistently with *Dignity*, *St. Peter's*, and *CHI*, then there is no need to reach the other issues presented in Defendants' Motion. On the other hand, if the Court concludes that a non-church entity can establish a church plan, then further factual issues would be presented as to whether the Plan satisfies the other requirements for a church plan, including whether it is "maintained" by a qualifying entity and whether Advocate is "controlled by or associated with" a church. And if the Plan did qualify as a church plan under the statute, it would be an unconstitutional religious accommodation in violation of the Establishment Clause of the Constitution. These follow-up issues are factual, would require a record not now before the Court, and cannot be resolved on a motion to dismiss.

## II.  THE ALLEGATIONS OF THE COMPLAINT

What *is* before the Court is the Complaint ("Comp."). The allegations in it are detailed, describing among other things the background of ERISA, Comp. ¶ 26, the protections ERISA provides to pension plan participants, *id.* ¶¶ 27-28, the church plan exemption as originally

adopted, *id.* ¶¶ 29-31, the 1980 amendment to the definition, *id.* ¶¶ 32-39, Advocate's structure and business, *id.* ¶¶ 40-56, the Plan, *id.* ¶¶ 57-65, 83-101, the factual ingredients of the Establishment Clause analysis, *id.* ¶¶ 105-107, and the harms suffered by the participants. *Id.* Counts I – X. We summarize the key allegations here.

Advocate operates a large healthcare conglomerate—indeed, it is the largest health care provider in Illinois, with 12 hospitals and more than 250 sites offering various types of care. *Id.* ¶¶ 19, 40. Advocate has annual operating revenues of approximately $4.6 billion and assets of approximately $7.8 billion. *Id.* ¶¶ 19, 41. Advocate employs over 33,300 people. *Id.* ¶¶ 19, 42.

Advocate (or its predecessor)—neither of which are churches—established the Plan. *Id.* ¶¶ 87, 89.[6] Advocate does not deny these allegations. MTD at 12-18. Advocate also maintains the Plan. Comp. ¶¶ 87-90. Although Advocate claims that a committee maintains the Plan, MTD at 7, that committee is merely a non-juridical subset of Advocate. Advocate itself maintains the Plan as an ordinary corporate function, acting through its employees. Comp. ¶¶ 87-90.

Although Advocate admits it is not a church, it claims that its documents show—as a matter of law—that it is controlled by or associated with a church. MTD at 10-11. But the detailed allegations of the Complaint demonstrate, with specificity, why, under the relevant legal standards, Advocate is *not* controlled by or associated with a church. *See infra* Section IV.D.

Advocate does not administer the Plan in accordance with ERISA; rather it evades ERISA's protections for plan participants by claiming the Plan is an exempt "church plan." MTD at *e.g.*, 1. As a result of Advocate's decision to not comply with ERISA, Plaintiffs' pensions are not: (i) fully vested; (ii) correctly funded; (iii) insured by PBGC; or (iv) protected by other crucial ERISA requirements. Comp. *e.g.*, Counts I–X.

### III. LEGAL STANDARD

Under Fed R. Civ. P. 12(b)(6), a court denies a motion to dismiss if the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

---

[6] At the time Plaintiffs filed their Complaint, they were not sure whether Advocate or its predecessor established the Plan. However, the Plan document (MTD Ex. B) says that Advocate's predecessor, the Evangelical Hospital Association, "established" the Plan. *Id.* § 1.1

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Specific facts are not necessary;" a complaint "need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (internal quotations omitted).

Advocate argues, in a footnote, that this Court lacks subject matter jurisdiction. MTD at 9 n.15. As Advocate acknowledges, however, motions to dismiss claiming that a plan is not covered by ERISA are categorized as "failure to state a claim" (Rule 12(b)(6)) arguments rather than "authority to hear the case" (Rule 12(b)(1)) arguments. *Kuttner v. Zaruba*, 2011 WL 691868, at *5 n.8 (N.D. Ill. Feb. 22, 2011).[7]

## IV. ARGUMENT

### A. Defendants' Reading of ERISA Removes any Church from the Exemption.

Before turning to the statutory language, we note that absent from Advocate's supposed church plan is any church that claims responsibility for it. When a church establishes a church plan, that church is accountable for those pensions. Permitting a non-church to establish a church plan removes the church from the church plan exemption, leaving employees doubly vulnerable: without the involvement of a church or the protections of ERISA.

And those ERISA protections are important. Congress enacted ERISA in the light of several highly publicized failures of private pension plans, especially that of Studebaker Corporation, leaving long term employees at the end of their careers without their promised benefits. John H. Langbein *et al.*, *Pension and Employee Benefit Law* 78-83 (5th ed. 2010) ("The Studebaker Incident"). ERISA "seek[s] to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink,* 517 U.S. 882, 887 (1996). "To increase the chances that employers will be able to honor their benefits commitments—that is, to guard against the possibility of bankrupt pension funds—Congress incorporated several key measures into ERISA." *Id.* These measures include minimum funding

---

[7] *See also Daft v. Advest, Inc.*, 658 F.3d 583, 590-91 (6th Cir. 2011) (whether a plan is an ERISA plan "must be considered an element of a plaintiff's claim under [ERISA], not a prerequisite for federal jurisdiction."); *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 971 (9th Cir. 2012).

and vesting requirements, PBGC insurance, and rules concerning reporting, disclosures, and fiduciary responsibilities. *See, e.g.,* ERISA § 302. Consistent with this background, policy, and purpose, ERISA coverage should be construed "liberally" to provide "maximum" protections for workers, and "exemptions should be confined to their narrow purpose," S. Rep. No. 93-127 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4838, 4854; *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 97 (1993) (the court is "inclined, generally, to tight reading of exemptions from comprehensive schemes of this kind . . . ."). As the *St. Peter's* court recently explained in rejecting the same arguments set forth by Advocate here:

> The Court cannot conclude that Congress intended to create this slippery slope, especially considering that the point of enacting ERISA was to promote the interest of employees and their beneficiaries. Opening the door to expand the church plan exemption to this extent would place more employees at risk of having insufficient benefits upon retirement. What must be kept in mind is that ERISA is a remedial statute, so any exemptions included thereunder should be construed narrowly. Defendants' interpretation would achieve quite the opposite.

2014 WL 1284854, at *6 (citation omitted).

## B.     The Statutory Text Makes Clear That Only a Church May Establish a Church Plan.

The threshold and dispositive issue is whether a non-church, such as Advocate (or its predecessor), may establish a church plan. *See* MTD at 12-18. A church plan is defined in ERISA § 3(33).[8]

Section 3(33)(A) provides that "[t]he term 'church plan' means a plan established and maintained . . . for its employees . . . by a church or by a convention or association of churches." ERISA § 3(33)(A). The *Dignity* court hit the nail on the head: "A straightforward reading of this section is that a church plan 'means,' and therefore by definition, *must be* 'a plan established . . . by a church.'" 2013 WL 6512682, at *4 (emphasis in original).[9]

The *St. Peter's* court conducted its own "plain text analysis" of the statute and reached the same result: "[I]f a church does not establish the plan, the inquiry ends there." 2014 WL 1284854, at *5. And the magistrate judge in *CHI* agreed. "Two of the cases [*Dignity* and *St. Peter's*] closely

---

[8] The text of the statute is attached as Ex. 6.
[9] *See also Burgess v. United States*, 553 U.S. 124, 130 (2008) ("As a rule, a definition which declares what a term 'means' . . . excludes any meaning that is not stated.") (citations and quotations omitted).

examine the language of the statute and determine that a church plan must be established by a church. . . . This Court's analysis of the statute reaches the same conclusion. . . ." *CHI*, 2014 WL 3408690, at *6 (citations omitted).

The Advocate Plan was not established by a church. Comp. ¶¶ 3-4. Defendants do not contest this. MTD at 7, 12-25; MTD Ex. B, § 1.1 (the Plan "was established" by Advocate's predecessor in interest). This ends the inquiry; the Advocate Plan is not a "church plan" as a matter of law. *See Dignity*, 2013 WL 6512682, at *7 (a nonprofit healthcare conglomerate "does not have the statutory authority to establish its own church plan, and is not exempt from ERISA as a matter of law"); *St. Peter's*, 2014 WL 1284854, at *8; *CHI*, 2014 WL 3408690, at *9. On this ground alone, the Court should deny the Motion; it need not reach any other issue.

## C.     ERISA Section 3(33)(C) Does Not Alter this Conclusion.

Advocate recognizes that section A of the church plan definition says what it says. It argues, however, that section C removes the requirement from section A that a church plan be established by a church. MTD at 15-18 (relying on section C(i)); MTD at 19-20 (relying on section C(ii)). Section C(i) provides that a church plan may be *maintained* by an administrative church organization. ERISA § 3(33)(C)(i). Section C(ii) provides that employees of a church-associated organization may be *included* in that church's plan. *Id.* at § 3(33)(C)(ii). However, as the courts in *Dignity*, *St. Peters*, and *CHI* held based on a straightforward reading of the statute, neither provision alters the basic requirement in ERISA § 3(33)(A) that a church plan must be *established* by a church. *E.g.*, *Dignity II*, 2014 WL 3613096, at *6 ("The Court is not compelled by the legal gymnastics required to infer from section C's grant of permission to church associations to maintain a church plan, or its broad view of which employees may be covered by a church plan— that a church plan may be established by any entity other than a church or a convention or association of churches as set forth in section A.").[10] We address each provision in turn.

### 1.     The Provision Regarding Who May *Maintain* a Church Plan Does Not Change Who Must *Establish* a Church Plan.

ERISA § 3(33)(C)(i) provides that a plan "established and maintained . . . by a church . . .

---

[10] *See also St. Peter's*, 2014 WL 1284854, at *5; *CHI*, 2014 WL 3408690, at *7-8.

includes a plan maintained by an organization" whose "principal purpose or function . . . is the administration or funding of a plan . . . if such organization is controlled by or associated with a church." ERISA § 3(33)(C)(i). Although this section expands the scope of entities that may *maintain* a church plan (a church or administrative church organization), it does not change the scope of the entities that may *establish* a church plan (only a church) under section A.[11]

Defendants note that the words "established and maintained" from section A are repeated at the start of section C(i), MTD at 14, but ignore that section C(i) omits the word "established" following the word "includes." Thus, the phrase "established and maintained" at the *start* of section C(i) makes clear that the section A definition of a church plan is unchanged, while the rest of section C(i) makes clear the only modification is to who may "maintain" a church plan.[12]

Defendants' attempt to rely on the fact that section C(i) uses the word "includes" instead of "subject to," MTD at 15-16, fails. As already noted, the word "includes" in subsection C(i) "merely provides an alternative to the maintenance requirement but does not eliminate the establishment requirement." *St. Peter's*, 2014 WL 1284854, at *7. Moreover, that a plan "maintained" by a church-associated organization must still be established by a church is not contingent on reading any words into the statute. Rather, as the courts in *Dignity*, *St. Peter's*, and *CHI* have made clear, section A's establishment requirement remains unchanged by section C(i).

Reading section C(i) as extending church plan status to any plan maintained by an administrative church organization, "regardless of whether the plan was established by a church,"

---

[11] *See, e.g.*, *Dignity*, 2013 WL 6512682, at *5 ("notwithstanding section C, which permits a valid church plan to be maintained by some church-affiliated organizations, section A still requires that a church establish a church plan"); *St. Peter's*, 2014 WL 1284854, at *5 ("The key to this interpretation is to recognize that subsection A is the gatekeeper to the church plan exemption: although the church plan definition, as defined in subsection A, is expanded by subsection C to include plans maintained by a tax-exempt organization, it nevertheless requires that the plan be established by a church or a convention or association of churches."); *CHI*, 2014 WL 3408690, at *8.

[12] *See Dignity*, 2013 WL 6512682, at *5 ("[R]epetition of the word 'maintain' [in section C(i)] without the word 'establish' suggests that only the category of 'who may maintain a church plan' is being expanded upon in section C(i), not the category of 'who may establish a church plan.'"); *St. Peter's*, 2014 WL 1284854, at *6 (defendants' reading of subsection C(i) erroneously inserts the word "established" after the word includes); *CHI*, 2014 WL 3408690, at *8 (noting that although the "language of section C mirrors the language of section A in the first portion of the sentence . . . [,] Congress did not include the phrase '*established and* maintained' when clarifying that a church plan 'includes a plan maintained by a [church-affiliated] organization.'") (emphasis in original).

would "violate[] long-held principles of statutory construction." *Dignity*, 2013 WL 6512682, at *4-5 (explaining how such an interpretation violates numerous canons of statutory interpretation). For example, it "violates a 'cardinal principle of statutory construction' . . . to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section." *Id.* at *4 (quoting *Bennett v. Spear*, 520 U.S. 154, 173 (1997)). Congress amended the statute in 1980 to add section C(i), but "Congress chose to retain the language in section A, that the '[t]he term 'church plan' means a plan established and maintained by a church.'" *Id.* Thus:

> To completely ignore the language of section A—language that Congress actively retained—violates the principle to give effect to every clause and word and the related principle "not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."

*Id.* (citation omitted).[13]

Interpreting section C(i) as removing the "established" requirement in section A also "would reflect a perfect example of an exception swallowing the rule." *Dignity,* 2013 WL 6512682, at *5 ("[F]or such a specific exception to govern what a church plan is[] would completely vitiate the original rule embodied in section A . . . . The Court cannot agree . . . that Congress could have intended the narrow permission in section C(i) to—by implication—entirely consume the rule it clearly stated in section A.").

Moreover, if Congress had intended to remove the "established" requirement or "alter the types of entities that can establish a church plan, such amendment would have been made to section A, which again, clearly states that a church plan is one 'established and maintained . . . by a church or by a convention of association of churches.'" *Id.* at *6 (quoting 29 U.S.C. § 1002(33)(A)); *St. Peter's*, 2014 WL 1284854, at *6; *CHI*, 2014 WL 3408690, at *8.

Defendants' ignore these textual arguments and misconstrue Plaintiffs' position as being based only on legislative history. MTD at 12, 16. But the *Dignity*, *St. Peter's*, and *CHI* courts all

---

[13] *St. Peter's*, 2014 WL 1284854, at *6 (defendants' "interpretation ignores—and renders superfluous—Section A"); *CHI*, 2014 WL 3408690, at *7 (under defendants' argument, "section A's requirement that a church plan be established by a church . . . would be rendered meaningless"); *Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1272 (7th Cir. 1993) ("[A] court should not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous.") (citation and quotations omitted).

9

concluded that the text was unambiguous in requiring that a church plan be established by a church. As a result, *St. Peter's* and *CHI* found it unnecessary to consider legislative history.[14]

The *Dignity* court did consider the legislative history. When ERISA was enacted in 1974, it was undisputed that only a church could establish a church plan.[15] However, the definition of church plan was amended in 1980, and Defendants claim it was this amendment that supposedly expanded the church plan definition to include plans not established by a church. MTD at 11-12. *Dignity* rejected this argument, explaining that "[a]lthough the text is conclusive, . . . legislative history also strongly supports [this] reading." 2013 WL 6512682, at *6. The court explained:

> Prior to the amendment, because the statute read that a church plan was one "maintained by a church or by a convention or association of churches," churches whose plans were managed by pension boards were concerned about their status. . . . In response to the churches' concerns, Sen. Herman E. Talmadge of Georgia introduced legislation as far back as 1978, with language substantially identical to the language currently in section C(i) . . . .

*Id.* at *6-7.

Senator Talmadge later explained that "the purpose of his proposal was to expand the church plan definition to include 'church plans which rather than being maintained directly by a church are instead maintained by a pension board maintained by a church.'" *Id.* at *7 (quoting Senate Committee on Finance, Executive Session Minutes, June 12, 1980, at 40).[16] "Likewise, once the provision was incorporated into H.R. 3904, the Senate Labor and Human Resources Committee noted . . . the definition of a church plan 'would be continued' and only 'clarified to include plans maintained by a pension board maintained by a church.'" *Id.* at *7 (quoting Senate Labor and Human Resources Comm. Report on H.R. 3904, August 15, 1980).

---

[14] *E.g.*, *CHI*, 2014 WL 3408690, at *8 ("Because the . . . the language of the statute is unambiguous, it is not appropriate to consider the legislative history"); *St. Peters*, 2014 WL 1284854, at *9 (same).

[15] The text of the 1974 definition, Pub. L. No. 93-406, § 3(33), 88 Stat. 829 (1974), is attached as Ex. 7.

[16] Senator Talmadge further stated: "[I] understood that many church plans are maintained by separately incorporated organizations called pension boards. These boards have historically been considered by church denominations as parts of their church." 126 Cong. Rec. 20,245 (1980). Accordingly, he asked the Senate President to confirm "the bill would enable a church pension board to maintain a church plan." *Id.* The Senate President confirmed, noting that "[t]he bill recognizes the status of a church plan maintained by a pension board by providing that a plan maintained by an organization, whether separately incorporated or not, the principal purpose of which is the administration or funding of a plan . . . for the employees of a church, is a church plan, provided such organization is controlled by or associated with the church." *Id.*

Professor Stein also analyzed the legislative history, Stein, *supra*, at 8-12, and concluded:

> In short, the legislative history nowhere supports the idea that Congress intended to permit church agencies to sponsor their own pension plans – it merely intended to allow the employees of church agencies to participate in plans established and maintained by churches or conventions or associations of churches. The C(i) language was intended only to clarify that church plans did not lose their status as such because a church pension board maintained the plan.

*Id.* at 11-12.

### 2. The Provisions Regarding Who May Be *Included* in a Church Plan Do Not Change Who Must *Establish* a Church Plan.

Defendants go beyond section C(i) to argue that it does not even matter who maintains a church plan, arguing instead that a plan can be a church plan merely if its sponsor is controlled by or associated with a church. MTD at 2, 19-20, 22-23. This is based on a blatant distortion of sections C(ii) and C(iii). These provisions provide, in pertinent part, that employees of an organization "controlled by or associated with a church" ("church-associated organization") can be *included* in that church's plan. *See* ERISA § 3(33)(C)(ii), (iii). This is accomplished as follows: section C(ii) defines "employee of a church" to include employees of a church-associated organization; and section C(iii) deems the church to be the employer of these newly defined "employees." *Id.* This redefinition of "employee" and "employer" was necessary to allow a church plan covering employees of church-associated organizations to retain its legal status as a "plan," both under ERISA and for the purposes of various tax-qualification requirements under Internal Revenue Code ("IRC"). More specifically, both ERISA and the IRC require that "plans" be sponsored by an employer and for the benefit of the employer's employees. ERISA § 3(2);[17] 26 U.S.C. § 401(a) (2014).[18] Thus, if a church plan covers employees of a church's associated organization, the organization's employees must be deemed employees of that church and that

---

[17] *See also Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982) (en banc) ("The gist of ERISA's definitions of employer, . . . participant, and beneficiary is that a plan . . . covers ERISA participants because of their employee status in an employment relationship, and an employer . . . is the person that establishes or maintains the plan . . . ."); *Sipma v. Mass. Cas. Ins. Co.*, 256 F.3d 1006, 1009 (10th Cir. 2001).

[18] 26 U.S.C. § 401(a) (2014) (trust forming part of a "pension . . . plan of an *employer* for the exclusive benefit of his *employees* . . . shall constitute a qualified trust") (emphasis added); 26 C.F.R. §§ 1.401-1(a)(2) and (b) (2014).

church must be their deemed employer.

As *Dignity* and *St. Peter's* make clear, these provisions only expand the scope of individuals who can be *included* in a church plan (employees of both a church and its associated organizations); they do not change the section A definition of who can *establish* a church plan (only a church).[19] Moreover, that a church is "deemed" the employer of its associated organization's employees does not mean the associated organization is deemed a church or the church is deemed to have established the associated organization's plan. "Section C(ii) merely explains which employees a church plan may cover—once a valid church plan is established. It does nothing more." *Dignity*, 2013 WL 6512682, at *5; *St. Peters*, 2014 WL 1284854, at *5.

The legislative history supports this interpretation. Under ERISA as adopted in 1974, the participants of church plans were basically limited to church employees. As an accommodation, *pre-existing* church plans that *already* included employees of church-related organizations were permitted to continue, but only until the end of 1982.[20] *See* H.R. Rep. No. 93-1280 (1974), 1974 U.S.C.C.A.N. 5038, 5044. As the sponsors of the 1980 amendment explained, absent amendment "churches must by 1982 divide their plans into two parts, one covering employees of the church and one covering employees of church agencies." 124 Cong. Rec. 12,107 (1978) (Rep. Conable). The legislative history makes clear that the 1980 amendments sought to address this concern by adding sections C(ii) and (iii) to permit all church plans, not merely those existing in 1974, to include employees of church-related entities indefinitely:

- "The present law definition of the term 'church plan' is continued . . . so that a church plan which covers the employees of a church agency generally would be exempt from . . . ERISA." 126 Cong. Rec. 19,599 (1980) (official summary); and

---

[19] *See Dignity*, 2013 WL 6512682, at *5 ("That an established church plan may include employees of a church-associated organization, however, does not mean that an associated organization may *establish* a church plan.") (emphasis in original); *St. Peter's*, 2014 WL 1284854, at * 5 ("Once a church plan is established . . . , subsection C(ii) delineates what individuals may participate in the church plan as employees of the church."). As the *CHI* defendants relied on only section C(i), the *CHI* court, in concluding that only a church could establish a church plan, did not have reason to consider section C(ii). *See CHI*, 2014 WL 3408690, at *8.

[20] Contrary to Defendants' representation, the original exemption did not provide that "plans of 'church agencies' would be treated as being established or maintained by a church," MTD at 19, but rather provided only that certain pre-existing plans could include employees of such "church agencies."

- "The bill would permit a church plan to cover employees of a tax-exempt agency controlled by or affiliated with a church . . . ." 126 Cong. Rec. 20,208 (1980).[21]

Defendants cite passages in the legislative history addressing the importance of certain church-associated organizations, but distort the context of these passages. MTD at 19-20. These passages address only reasons why *employees* of such church-associated organizations should be *included* in plans *established by churches*. As Professor Stein concluded, "[t]he legislative history nowhere supports the idea that Congress intended to permit church agencies to sponsor their own pension plans." Stein, *supra*, at 11. In fact, ironically, the United Church of Christ ("UCC") itself made this clear in the legislative process. In support of the 1980 legislation, the "Pension Boards of the United Church of Christ" sent a letter to Senator Talmadge, which was then published in the *Congressional Record*. It thanked Senator Talmadge for sponsoring "legislation intended to clarify the exemption of churches from the provisions of ERISA and to provide for the coverage of church agencies and ministers, wherever carrying out their ministry, *within the church plan*." 125 Cong. Rec. 10,055-56 (1979) (emphasis added).

### 3.      Contrary Judicial Decisions Are Neither Controlling Nor Persuasive.

Prior to the recent wave of church plan cases, a number of courts had erroneously extended the church plan exemption to plans established by church-associated organizations. Predictably, Advocate relies on many of these. MTD at 12 n.18, 12-18. These opinions are not binding, are not persuasive, and cannot change the statutory text and its legislative history. *See generally Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 354, 357, 371-72 (S.D.N.Y. 2010) (noting phenomenon of "unwitting perpetuation of error" and refusing to adopt interpretation of the Martin Act "perpetuated from opinion to opinion with little second-guessing" despite being "unsupported by the Martin Act's plain language [and] its legislative design").

The *Dignity* court reviewed this case law with particular care:

---

[21] *See also* 124 Cong. Rec. 16,523 (1978) (remarks of Sen. Talmadge) (the legislation "retain[s] the definition of church plan as a plan established and maintained for its employees by a church" but in order to accommodate different church structures "all employees are deemed to be employed by the denomination"); 124 Cong. Rec. 12,107 (1978) (remarks of Rep. Conable) ("The bill achieves this result by retaining the basic definition of a church plan as a plan established and maintained for its employees by a church . . . . The term 'employee,' however, is redefined . . .").

> Although those cases are not binding authority, the Court has nevertheless examined each contrary case and is not convinced by the reasoning the cases employed. . . . [T]he contrary cases themselves differ in their interpretations of the statutory text. Several cases . . . appear to have read section C(i)'s language on who may maintain a church plan to abrogate the limitations clearly set out in section A on who can establish a church plan. Yet others overlooked the express limitation on section C(i) that an organization maintaining a church plan must have as its "principal purpose or function . . . the administration or funding of a [benefits plan]" and cannot simply be a church-affiliated healthcare organization, or publishing house. And still others read into the statute's broad definition of employees who may be covered by a church plan, a completely different idea that church-affiliated organizations may start their own church plans. . . . [T]he Court is not persuaded by these flawed approaches.

*Dignity*, 2013 WL 6512682, at *6 (citations omitted).[22] The *St. Peter's* court reached the same conclusion after their review of prior authority.[23] Notably, this district's earlier opinion in *Friend*, 68 F. Supp. 2d at 973, was specifically criticized in *St. Peter's*. 2014 WL 1284854, at *8. In any event, *Friend* has no bearing on the issues here.[24]

The decision in *Ascension* is, in fact, the only one of the recent church plan opinions that has reached a different result, and Defendants rely on it heavily, *e.g.*, MTD at 2, relegating *Dignity* and *St. Peter's* to a terse "*But see*" cite. MTD at 16-17. (*CHI* had not been decided when their motion was filed.) We invite the Court to simply review the four opinions in sequence, and Professor Stein's article, and decide for itself whether the *Ascension* analysis is persuasive. To assist the Court in that task, the following four points are worth noting.

First, on the key statutory interpretation issue, the *Ascension* court assumes its conclusion without any textual support. Specifically, its summary of section C(i)—that "if A is exempt and A includes C, then C is also exempt"—assumes, without analysis, that C (which presumably is a plan

---

[22] *Thorkelson v. Publ'g House of Evangelical Lutheran Church*, 764 F. Supp. 2d 1119 (D. Minn. 2011), relied on by Defendants, is among the cases criticized in *Dignity* and *St. Peter's*. *Dignity*, 2013 WL 6512682, at *6; *St. Peter's*, 2013 WL 1284854, at *7. Professor Stein also criticized the case as being "without any real statutory analysis" and being "simply a conclusion." Stein, *supra*, at 6. Moreover, in *Thorkelson* the plaintiffs alleged that the church was the alter ego of the church agency—there is no such claim here. In any event, the case settled and thus was never reviewed on appeal. *Id.* at 6 n.20.

[23] *See, e.g.*, *St. Peter's*, 2014 WL 1284854, at *7-8 ("[N]one of these previous decisions undertook a detailed statutory analysis . . . as Judge Henderson did in [*Dignity*]. Instead, these prior decisions often bypassed subsection A . . . and immediately applied subsection C(i), made conflicting determinations regarding the limitations of C(i), or even misstated the text of subsection C(i).").

[24] In *Friend* the parties and the district court *assumed*, without analysis, that a plan established by a church affiliate could be a church plan; the issue was the effect, given such an assumption, on the plan's failure to use a third party administrator. 68 F. Supp. 2d at 973. In any event, the decision, even if it were on point, is not binding on this Court. *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987).

maintained by a church-associated organization) need not be established by a church. *Ascension*, 2014 WL 2448492, at *10. But the *Ascension* court provides no support for this conclusion, and does not address any of the canons of statutory construction employed by the courts in *Dignity*, *St. Peter's*, and *CHI* in support of their conclusions that a section C(i) alters only who may *maintain* a church plan, not who may *establish* a church plan. *See supra* IV.C.1. Thus properly stated, the variable "C" in *Ascension*'s equation means nothing more than a plan established by a church and maintained by a church-associated entity.

And this interpretation of section C simply does not make sense. Indeed, based on the Ascension court's interpretation of section C, any non-profit entity, even a completely secular one, could establish a church plan as long as the members of the committee administering it claimed to be associated with a church.

Second, although *Ascension* was issued after *Dignity* and *St. Peter's* had been decided, the opinion does not consider their thorough analysis, mentioning only that "the Court does not find either case persuasive." *Ascension*, 2014 WL 2448492, at *9. The *CHI* court, comparing these opinions, found *Dignity* and *St. Peter's* more persuasive than *Ascension*. *CHI*, 2014 WL 3408690, at *6. Likewise the *Dignity* court recently rejected the invitation to reconsider his opinion in light of *Ascension*. *Dignity II*, 2014 WL 3613096, at *6.

Third, the court's analysis of the legislative history is far off base. The legislative history of the 1980 amendment is clear. *See supra* at IV.C.1. As Professor Stein recently noted, the *Ascension* court "[s]omewhat remarkably" purported to rely on the legislative history by citing "two stray sentences, which it lifted out of context." Stein, *supra*, at 10. However, these cited sentences "are entirely consistent with [Senator Talmadge's] only stated objective: to allow agencies and their employees to receive benefits under a plan established by a church." *Id.*

And finally, the court itself seemed uncertain of its analysis. In the court's "Coda" at the end of the opinion, it said "[t]he church exemption is a congressional choice of historic proportions," even though it may be "irrational." *Ascension*, 2014 WL 2448492, at *16. This is an odd observation. The 1980 amendment of "church plan" definition was a minor rider to a broad

pension plan reform bill, the Multiemployer Pension Plan Amendments Act of 1980. It was far from historic legislation. Its primary purpose was merely to remove the 1982 sunset provision so that church plans could continue to cover employees of certain church affiliates. As the official summary explained: "The present law definition of the term 'church plan' is continued without reference to dates." 126 Cong. Rec. 19,599 (1980). Properly read, the definition is not "irrational." It only becomes so if it is interpreted, as in *Ascension*, to permit non-church entities to claim church plan status and thus deny tens of thousands of non-church employees the protections of federal pension law. In short, the well-reasoned recent case law is uniform that only a church can establish a church plan.

### 4. The Private Letter Rulings Are Neither Controlling Nor Persuasive.

Advocate also relies on IRS Private Letter Rulings and Department of Labor ("DOL") advisory opinions, MTD at 12 n.18, 17, 20-22, which are all, in effect, carbon copies of an original 1983 IRS memorandum. IRS Gen. Couns. Mem. 39,007 (July 1, 1983). That perfunctory memorandum was wrong, and hence the follow-up letters, which added nothing to the analysis, are equally wrong. *See* Stein at 13 ("[T]he IRS position is almost certainly wrong.").

The *Dignity*, *St. Peter's*, and *CHI* opinions all concluded that the agency letters/opinions are simply not entitled to deference. First, they are not entitled to deference pursuant to *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984), because the statutory interpretations contained therein were not arrived at through "a formal adjudication or notice-and-comment rulemaking."[25] Second, although "interpretations contained in formats such as opinion letters are 'entitled to respect' under . . . *Skidmore v. Swift*," this is true "only to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The letters and advisory

---

[25] *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters— . . . which lack the force of law—do not warrant *Chevron*-style deference."); *accord Dignity*, 2013 WL 6512682, at *3 n.3; *St. Peter's*, 2014 WL 1284854, at *10; *CHI*, 2014 WL 3408690, at *10. Defendants' argument that "Congress is deemed to have approved the interpretation," MTD at 21, is erroneous for this same reason, as this concept applies only to formal agency regulations and interpretations, not informal private letter rulings. *See Cottage Sav. Ass'n v. C.I.R.*, 499 U.S. 554, 561 (1991). Moreover, interpretations of "longstanding duration" are entitled to respect only if "cogent" and "well-reasoned." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 487-88 (2004).

opinions interpreting the church plan definition lack any "power to persuade."[26] Defendants' contention that these letters are not "conclusory" is based solely on the IRS's analysis of facts related to control and association. MTD at 22. Defendants ignore that these letters provide no meaningful analysis of the threshold question of statutory construction regarding whether non-church entities may establish church plans.

These letters do not track the plain text of the statute, which makes clear that only churches can "establish" church plans. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2169 (2012) (no deference under *Skidmore* to DOL interpretation that is "quite unpersuasive," "lacks the hallmarks of through consideration," and "inconsistent" with the statute). They were prepared in informal, non-adversary circumstances, and successive letters repeat earlier ones virtually verbatim. Recognizing the limitations of such letters, courts routinely refuse to defer to them.[27]

Finally, that Advocate cites IRS letters that specifically addressed that Plan does not change the fact that the statutory construction reflected therein is not entitled to deference and is not persuasive. Indeed, as the *Dignity* court recently stated, "[a]n erroneous IRS ruling . . . should not be permitted to trump a Court's interpretation of a statute . . . and certainly should not be permitted to persist indefinitely simply by virtue of having come first." *Dignity II*, 2014 WL 3613096, at *2 (citing *Dixon v. United States*, 381 U.S. 68, 74 (1965) (IRS rule "out of harmony with the statute[] is a mere nullity.")).[28]

**5.      The Canon of Constitutional Avoidance Supports this Construction.**

Although the statutory text and legislative history are clear, the canon of constitutional avoidance further compels the conclusion that church plans must be established by churches.

---

[26] *Dignity*, 2013 WL 6512682, at *3 n.3 ("The letters do not analyze the statute closely or evaluate how its language applies to Dignity. Because the IRS's letters are conclusory, even under the *Skidmore* framework, they are not entitled to deference."); *St. Peter's*, 2014 WL 1284854, at *10; *CHI*, 2014 WL 3408690, at *10.

[27] *E.g.*, *Thornton v. Graphic Commc'ns Conference*, 566 F.3d 597, 615-16 (6th Cir. 2009) (no deference to IRS letter given informal nature and absence of rationale explaining conclusions); *Welsh v. Ascension Health*, 2009 WL 1444431, at *7 n.11 (N.D. Fla. May 21, 2009) (letters "may not be used or cited as legal precedent."); *Tupper v. United States*, 134 F.3d 444, 448 (1st Cir. 1998) (IRS General Counsel Memoranda "are not authority in this court.").

[28] *See also Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 978 (7th Cir.1998) ("Neither the courts nor the IRS may rely on letter rulings as precedent.").

"[S]tatutes should be interpreted to avoid constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 379 (2005); *accord Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn into question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."). Thus, "when deciding which of two plausible statutory constructions to adopt, . . . [i]f one of them would raise a multitude of constitutional problems, the other should prevail." *Clark*, 543 U.S. at 380-81. As explained below, Plaintiffs have adequately alleged that if the church plan exemption did extend to plans sponsored by non-church entities like Advocate, the exemption would be an unconstitutional accommodation of religion in violation of the Establishment Clause.

The Court need not resolve this constitutional claim at this stage. "[O]ne of the canon's chief justifications is that it allows courts to avoid the decision of constitutional questions[,] . . . resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark*, 543 U.S. at 381. Thus the canon of constitutional avoidance further supports the conclusion that church plans must be established by churches.

**D.  Even if Some Non-Church Entities Can Establish a Church Plan, Advocate Cannot.**

Even if a non-church entity could establish a church plan pursuant to section 3(33)(C), Advocate may not because it is not "controlled by or associated with a church." More precisely, given the current procedural posture, Plaintiffs have pleaded facts supporting a plausible inference that Advocate is not "controlled by or associated with a church." *See* Comp. ¶¶ 92-101. Further analysis of this inherently factual issue is inappropriate on a motion to dismiss. *See, e.g.*, *Torres v. Bella Vista Hosp., Inc.*, 523 F. Supp. 2d 123, 135 (D.P.R. 2007) (whether plan is a church plan "should be presented in a format better designed for a full airing of the issues").[29]

**1.  Defendants Improperly Ask This Court To Review Extrinsic Documents.**

The Motion before the Court is a Motion to Dismiss. No answer has been filed; there has been no discovery. In fact, Defendants have not even served an initial disclosure statement.

---

[29] *See also Sylvester v. Providence Healthcare Risk Man.*, 2005 WL 3940177, at *3 (S.D. W. Va. Oct. 27, 2005).

Nevertheless, Advocate submits with its motion 315 pages of documents, none which were mentioned in the Complaint, and relies on these documents extensively in its Motion for the proposition that Advocate is controlled by or associated with the UCC and the Evangelical Lutheran Church in America ("ELCA"). MTD at 4-8, 23-25.

A court does not consider documents or allegations extrinsic to the pleadings on a Rule 12(b)(6) motion. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). If the Court considers matters outside the pleadings, "the motion shall be treated as one for summary judgment" under Rule 56. Fed. R. Civ. P. 12(d). However, the Seventh Circuit disfavors such conversions. *See, e.g.*, *Gen. Elec.*, 128 F.3d at 1082 (finding abuse of discretion where district court took judicial notice of a fact that was subject to dispute).[30]

Because none of Defendants' extrinsic documents was referenced in the Complaint, the Court could consider them only if they were judicially noticeable. *Id.* at 1081. A fact is judicial noticeable if it is "not subject to reasonable dispute" in that it is either (1) "generally known within the territorial jurisdiction of the trial court" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice is exceptional because it "substitutes the acceptance of a universal truth for the conventional method of introducing evidence." *Gen. Elec.*, 128 F.3d at 1081.

Judicial notice of Advocate's documents is improper because, with few exceptions, these documents are offered for the truth of the matters asserted rather than for the mere fact of their existence.[31] Additionally, judicial notice of Advocate's extraneous documents is improper because: (1) Advocate presents a limited, self-serving sample of documents, *contra Jones v. City of Cincinnati*, 521 F.3d 555, 561-62 (6th Cir. 2008) ("[w]here the evidence captures only part of the incident and would provide a distorted view of the events at issue.") (quotations omitted);

---

[30] If the Court converts Defendants' motion to one for summary judgment, Plaintiffs would request the Court defer ruling on the motion and allow Plaintiffs leave and time for discovery. Fed. R. Civ. P. 12(d).

[31] *Contra Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1025 n.3 (N.D. Ill. 2010) ("to the extent that the Seventh Circuit has allowed judicial notice of documents such as SEC filings generally, it has done so for purposes other than establishing the truth of the matter in question."); *George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1044 (N.D. Ill. 2009) (same).

(2) the facts and their significance are subject to reasonable dispute, *contra Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) (noting that "indisputability is a prerequisite" and concluding that judicial notice was not proper where there existed "considerable argument over the significance" of the SEC filing at issue); and (3) the exhibits are not "sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Plaintiffs point out some of the difficulties in the extraneous documents below.

Advocate's limited, self-serving selection of documents relates to a contingent, disputed issue of fact: whether Advocate is controlled by or associated with the UCC and the ELCA. For instance, MTD Exhibits H and I purport to be Covenantal Agreements between Advocate and local branches of the UCC and ELCA. The truth of the matters stated in these documents is plainly in dispute, as is whether they are authentic or accurate. These covenantal agreements state that "Advocate . . . [is] fully responsible for [its] own management and fiscal affairs." MTD Ex. I, at 1; MTD Ex. H at 1. This raises many questions that cannot be decided on a motion to dismiss, for instance: is a large health care organization that is "fully responsible for [its] own management and fiscal affairs" really controlled by or associated with a church? The covenantal agreement between Advocate and the local ELCA synod has similar language and raises similar questions. MTD Ex. H. Without discovery, Plaintiffs and the Court do not know whether these documents are current, how they were created, who approved them, or how they are enforced.

Similar problems plague Advocate's other extraneous documents. Although the *existence* the IRS Private Letter Rulings (MTD Exs. K, L) is perhaps judicially noticeable, Plaintiffs dispute whether Advocate provided the IRS with all facts relevant to the control or association conclusions the IRS made. MTD Exhibits A, B, D, and M are documents relating to the Plan or Advocate's corporate structure. Documents like the purported Plan document (MTD Ex. A) or the purported financial statement (MTD Ex. D) are often incorporated by reference in an ERISA action because, in those cases, *the documents are publicly filed as part of compliance with ERISA*. Advocate, however, is not complying with ERISA, and none of the documents have been filed with a government entity. That means that they are subject to all kinds of questions: when were the

documents created? Are they currently operative? Were they sent to or available to participants? Plaintiffs further note significant disputes about whether Advocate is implementing the terms of the documents or the assumptions underlying the financial statement.

There is no basis for taking judicial notice of the contents of Advocate's website (MTD Exs. C, E). These pages contain self-serving statements, and without discovery there is no way to determine when they were created or who created or approved of them.

The UCC and ELCA Yearbooks (MTD Exs. F, G) are not judicially noticeable for the truth or significance of their contents. They were not created by government entities and discovery is needed to test the methods employed for determining inclusion therein. Moreover, their significance is plainly in dispute. For instance, UCC directory purports to list organizations to ensure they are considered "tax exempt organizations." MTD Ex. F, at 2. Not all tax-exempt organizations, however, are churches or eligible for the church plan exemption to ERISA.

This is not a summary judgment motion. As the *Dignity* court recently explained:

> Dignity submits volumes of documents as an appendix to its motion . . . . [H]owever, a court may take judicial notice of documents only for their existence, not the truth of the contents therein. As Dignity cites to these documents for the truth of the matters asserted within, the Court finds the documents inappropriate for judicial notice and declines to review them here on a motion to dismiss.

2013 WL 6512682, at *2 n.2 (citations omitted). Only in *Ascension* did the court consider extraneous documents. But *Ascension* is simply inconsistent with the clear rule that on a motion to dismiss, extraneous documents cannot be offered for the truth of their assertions and cannot be considered at all unless they are "sources whose accuracy cannot reasonably be questioned."

## 2. No Church "Controls" Advocate

Advocate is not controlled by any church. Even Advocate's improper, extraneous documents do not establish, and certainly not as a matter law, that the UCC and the ELCA control Advocate. The Covenantal Agreements with the Illinois Conference of the UCC and the Synod of the ELCA each provide that "Advocate and the Conference [or Synod] are each fully responsible for their own management and fiscal affairs, and accountable through their governing bodies to their respective mission statements." MTD Exs. I, at 1, H at 1. Rather than church control, the

UCC and Advocate "commit[] to listen, hear, and carefully consider the advice, counsel, and requests of the other." MTD Ex. I, at 4.

The ELCA and UCC members of Advocate's Board of Director's—or various other committees—do not demonstrate church control. *Contra* MTD at 5-6, 23. Under Illinois law, *directors owe their loyalty solely to the corporation.* As stated by an Illinois appellate court:

> The rule is well established in Illinois that officers and directors of a business corporation occupy a fiduciary relation to the corporation. The statutory provisions pertinent to the management of the affairs of a corporation not for profit . . . are similar to those applicable to business corporations . . . . The officers and directors of a not for profit corporation should, therefore, be charged with the same degree of fidelity to the interests of the corporation as are the officers and directors of a business corporation.

*Mile-O-Mo Fishing Club, Inc. v. Noble*, 210 N.E.2d 12, 15 (Ill. App. Ct. 1965) (citing *Shlensky v. S. Parkway Bldg. Corp.*, 166 N.E.2d 793, 796 (Ill. 1960)). Advocate's by-laws support this principle, as they indemnify a director only "if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation . . . ." MTD Ex. A, at 15. Thus, directors are obligated under both Illinois law and Advocate's own documents to act only in the best interests of the corporation, not the ELCA or the UCC.[32] Advocate certainly cannot show that it is controlled by a church as a matter of law.

### 3. Advocate Is Not "Associated With" Any Church Within The Meaning Of ERISA.

An organization is "associated with" a church only if it "shares common religious bonds

---

[32] Defendants fail to show control for the following additional five reasons: First, there is no provision in the bylaws showing any control over Advocate's Retirement Plan. Powers to approve *corporate* actions do not demonstrate that either the ELCA or the UCC "controlled" Advocate or its Board with respect to the Plan. *Dignity II*, 2014 WL 3613096, at *5. Second, the Board itself has 22 members, MTD Ex. A, at 2, and therefore the four members that affiliated with ELCA and UCC represent only a *minority* of board members. *See, e.g.*, *Dignity II*, 2014 WL 3613096, at *5 (rejecting similar argument, finding "no control" in part where "Sponsoring Congregations had only some representation – but not majority representation – on CHW's Board of Directors"). Third, Defendants note that "any act of the Board requires the approval of at least one Director from each of the churches." MTD at 6. However, this does not demonstrate that the churches controlled Advocate. For example, discovery may show that these directors were not active board members. Fourth, the bylaws were approved November 20, 2013, well after the Plan was established in January, 1973. Accordingly, Defendants provide no facts concerning the powers of Advocate's (or its predecessor's) Board, and/or who the Board was allegedly controlled by, at the time of the Plan establishment up to November, 2013. Discovery may demonstrate that the predecessors to ELCA and the UCC had no control over the Board of Advocate's predecessor. And fifth, the "Mission and Spiritual Care Committee" (MTD at 7) have not control over the Plan, and can only make "recommendations" to the Board.

and convictions with that church." ERISA § 3(33)(C)(iv). A "conviction" is a strong belief, but a "bond" is more; by necessity, it "binds" two entities together.[33] Defendants have not established as a matter of law that Advocate shares common "bonds and convictions" with the UCC or the ELCA, and the Complaint plausibly alleges there are no such common bonds and convictions. Advocate is an independent organization constituted under Illinois law. Comp. ¶¶ 19-20. It is not owned or operated by a church, it does not receive funding from any church, and its employees are not required to be members of any church. *Id.* ¶ 6

      The association requirement requires far more than a vague connection between a healthcare conglomerate and a church. *See, e.g., Lown v. Cont'l Cas. Co.*, 238 F.3d 543, 548 (4th Cir. 2001) (naming "three factors" for "primary consideration" of association: "1) whether the religious institution plays any official role in the governance of the organization; 2) whether the organization receives assistance from the religious institution; and 3) whether a denominational requirement exists for any employee or patient/customer of the organization"); *Chronister v. Baptist Health*, 442 F.3d 648, 653 (8th Cir. 2006) (same); *Hall v. USAble Life*, 774 F. Supp. 2d 953, 958 (E.D. Ark. 2011) (same).[34] Using these factors, *Lown*, 238 F.3d at 548 found no "association" because the Baptist Convention "played no role in the governance of Baptist Healthcare" and Baptist Healthcare did not "receive[] any support from" the Convention."[35]

---

[33] *Compare* Webster's Third New International Dictionary of the English Language 499 (1986) (defining "conviction" to mean "a strong persuasion or belief"), *with id.* at 250 (defining "bond" to mean "an agreement binding one or more parties" or "a uniting or binding element or force"). A belief comes from within; a bond is an external limitation. *See Health Cost Control v. Fuxan*, 1997 WL 725440, at *2 (E.D. La. Nov. 17, 1997) ("The ordinary dictionary meaning of 'bonds' and 'convictions' implies a link that is much stronger and pervasive than just 'any' *i.e.*, a singular—religious connection."). Moreover, in federal financial contexts "common bond" has been narrowly construed. *See* 12 C.F.R. § 701 (2013), App. B, Ch. 2, ¶ III.A.3 (despite Lutheran Church hierarchy in America, a common bond does not exist for "All Lutherans in the United States," which is too broadly defined; nor can "Members of St. John's Lutheran Church and St. Mary's Catholic Church located in Anniston, Alabama" be an association because "churches are not of the same denomination").

[34] Contrary to Defendants assertions, MTD at 24 n.21, nothing in *Lown* or *Chronister* suggests that this three factor test was specific to the Baptist conventions at issue in those cases.

[35] *See also Coleman v. Pikeville United Methodist Hosp., Inc.*, No. 05-32, 2008 WL 819038, at *3 (E.D. Ky. Mar 25, 2008) ("[T]he record is absent of any evidence that the Methodist church controls or exerts influence in any way in the governance of the Hospital"); *Chronister*, 442 F.3d at 652-53; *Polk v. Dubuis Health Sys.*, 2007 WL 2890262, at *3 (W.D. La. Sept. 28, 2007) ("no evidence that a denominational requirement exists for any employee or customer").

Advocate emphasizes its dedication to "serv[ing] 'the least among us'" as evidence of its common convictions with the UCC and ELCA. MTD at 24. Even setting aside that the statute requires common bonds, not merely common convictions, charity is required of every hospital.[36] The *Chronister* court held there were no common convictions although "under Baptist doctrine, operating a facility for health care is part of the healing ministry of the church." 442 F.3d at 652-53. Caring about the poor is laudable but is insufficient to show a bond; otherwise Advocate would be "associated with" with countless organizations that claim no religious affiliation at all.

### 4. The First Amendment Does Not Entitle Advocate To Unilaterally Claim An Exemption From Federal Law Free From Any Scrutiny.

Assessing whether Advocate shares common bonds and convictions with the ELCA and UCC does not require the court to assess "whether Advocate's conduct is within the doctrine" of the ELCA and UCC. *Contra* MTD at 24. Indeed, contrary to Defendants assertion, *id.*, Plaintiffs do not "attack" any "religious orthodoxy." Rather, because Advocate has chosen to claim an exemption from ERISA that is available only to churches, Plaintiffs seek to challenge only whether the Plan satisfies all of the requirements enumerated in the plain text of the statute.

The cases cited by Defendants do not preclude this inquiry, but rather stand for the limited proposition that courts should not intervene in *internal* church disputes. *See, e.g.*, *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976) (action related to whether defrockment of a Bishop was based on an arbitrary interpretation of church canon law by the *church judicatory*); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450-51 (1969) (First Amendment prohibits courts from deciding whether *churches* have departed from their doctrine).[37] Because this action does not present an internal church dispute—but rather

---

[36] Federal law has long *required* (i) *all* hospitals receiving Medicare payments to treat the indigent; and (ii) *all* non-profit hospitals to provide a community benefit. *E.g.*, 42 U.S.C. § 1395dd, *et seq.* (2011); 26 U.S.C. § 501(r) (2010). Moreover, Advocate did not have revenue of about $4.6 billion in 2012 serving the poor *gratis*, but by charging market rates for healthcare, like other hospitals. *See, e.g.*, Comp. ¶¶ 41, 47 (noting Advocate's CEO pay of over $3 million in 2011).

[37] Defendants quote *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694, 704 (2012), but the quote was taken from a discussion of cases holding that it is "impermissible for the government to contradict a *church's* determination of who can act as its ministers") (emphasis added). Although *N.L.R.B. v. Catholic Bishop*, 440 U.S. 490, 504 (1979), did not address an internal church conflict, that case is also inapposite, as the court merely noted that that "serious First Amendment questions that would follow" from the NLRB's exercise of jurisdiction over church-operated schools.

involves claims brought by lay plan participants regarding a plan sponsored by a non-church

entity—these cases are inapposite.

**E.   The Church Plan Exemption Does Not Apply For The Additional Reason That The Plan Is Not Maintained By Either A Church Or A Qualified Church-Associated Organization.**

Even if a non-church entity could establish the Plan, a church plan must be maintained by

either a church or a church-associated entity whose "principal purpose or function . . . is the

administration or funding of a plan." *See supra* § IV.C1. Defendants do not dispute that the Plan is

not maintained by a church. Instead, their argument is based on the claim that Advocate's

Administrative Committee is an "organization" that "maintains" the Plan. MTD at 17-18.

This argument fails because the Administrative Committee is merely a non-juridical subset

of Advocate and Advocate's principal purpose is the provision of healthcare, not running pension

plans. As the *Dignity* court explained, section C(i) does not permit a church plan to be maintained

by a sub-committee of an entity whose primary purpose is not plan administration. *See Dignity*,

2013 WL 6512682, at *5 ("While its Retirement Plans Sub–Committee's purpose is plan

administration, the statute does not say that the organization may have a subcommittee who deals

with plan administration. Rather, the statute dictates that organization itself must have benefits

plan administration as its 'principal purpose,' which Dignity plainly does not.").

Moreover, "maintaining" a Plan means more than administering it. To maintain a plan

"means to 'continue' a plan." *Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1265 (11th Cir.

2004) (citation omitted). To continue a plan, an entity must have authority to modify or terminate

it. *See Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 449 (5th Cir. 1995); *see also Anderson*, 369

F.3d at 1267. Advocate admits that the Administrative Committee cannot terminate the plan,

noting that the Administrative Committee "must be given notice" if the Plan is to be terminated.

MTD at 18. Getting notice of termination is different than the power to terminate. The

Administrative Committee, with no power to continue, amend or terminate the Plan, does not

maintain it. *See also* Stein, *supra*, at 12 ("Meaning of the Word 'Maintained'").

Finally, even if the Administrative Committee were an "organization" that maintained the

Plan, the church plan exemption still would not apply because the Committee is not controlled by or associated with a church. As has been seen, Advocate is not controlled by or associated with a church. These employees, who act wholly within the course and scope of their employment with Advocate cannot have a status distinct from their corporate employer. Moreover, the Committee must discharge its fiduciary duties under the Plan "solely in the interest of Participants," not in any purported interest of any church or religious mission. MTD Ex. B, § 17.12.

## F.      Plaintiffs Have Adequately Pled a Constitutional Claim.

If the statute here were interpreted to allow a non-church conglomerate like Advocate to unilaterally establish a church plan based on its professed religious affiliation, the church plan exemption would be an unconstitutional religious accommodation. Defendants challenge this alternative claim on two grounds: (i) whether Plaintiffs' have standing; and (ii) whether Plaintiffs' have stated a valid claim. As explained below, both of these arguments fail.

### 1.      Plaintiffs Have Standing to Pursue their Constitutional Claim.

Advocate' suggestion that Plaintiffs lack standing to assert the constitutional claim, MTD at 25-26, is, with all due respect, preposterous. If the Plan received an unconstitutional exemption from ERISA, Plaintiffs – and all Plan participants – would remain locked into an unregulated and uninsured pension plan. First and foremost, three of the four Plaintiffs will not receive the benefits they would be entitled to if the Plan were administered under ERISA. Second, the retirement savings of Plaintiffs and all class members are unprotected by federal law. Their fate, if Advocate decides to stop funding the Plan or ends up in bankruptcy, will be no different from the workers at Studebaker and other private companies who lost their retirement benefits after a lifetime of work and had, before ERISA was adopted, no effective redress.

Article III standing requires: (1) "injury in fact" that is "concrete and particularized"; (2) causation; and (3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). To establish an "injury in fact," the plaintiff must have a "personal stake" in the dispute, alleging an injury "particularized as to him." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Here, Plaintiffs do not assert a generalized grievance that Defendants violated the law. Rather, Defendants' ERISA

violations have caused concrete and particularized harm to Plaintiffs and the Class in that their pensions are: (i) not fully vested if the participant works for more than three years but less than five years (when ERISA requires vesting after three years); (ii) not correctly funded (when ERISA requires 100% funding); (iii) uninsured by the PBGC (when ERISA requires such insurance); and (iv) unprotected by other crucial ERISA requirements. Comp. *e.g.*, Counts I-X.

Defendants' argument that Plaintiffs cannot have standing unless they have been deprived of plan benefits, MTD at 26, is inconsistent with the well-established principle that a plaintiff has standing to protect procedural rights. *See, e.g.*, *Lujan*, 504 U.S. at 573 n.8 (an individual can "assuredly" enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing."). Plaintiffs have a right to ensure that critical ERISA protections are applied to their pensions.[38] Moreover, a trust beneficiary has Article III standing to challenge fiduciary misconduct regardless of whether such misconduct would cause a reduction in benefits.[39]

However, even if Article III standing required the loss of plan benefits, three of the four Plaintiffs have been deprived of the pension benefits to which they are entitled under ERISA. Under ERISA participants in a cash balance plan are entitled to receive the full value of their accrued benefits after three years of service. Advocate has informed Plaintiffs Stapleton, Roberston and Fox that they are not entitled to collect their accrued benefits as they have not completed five years of service, which is an illegal vesting requirement under ERISA. Comp. ¶ 131.

---

[38] When seeking injunctive or declaratory relief, threat of future harm can satisfy the injury-in-fact requirement. *See, e.g., Johnson v. Allsteel, Inc*., 259 F.3d 885, 888 (7th Cir. 2001) (holding that an ERISA plan administrator's increased discretion increased the risk that the participant would be denied benefits and that "[t]he increased risk the participant faces as a result is an injury-in-fact" for standing purposes); *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007) (finding injury in fact when plaintiffs claimed an increased risk of data theft after their information had been accessed by a malicious and sophisticated hacker).

[39] *See Scanlan v. Eisenberg*, 669 F.3d 838, 843-46 (7th Cir. 2012) (holding that injury in fact requirement did not require the value of the trust to be insufficient to pay discretionary distributions, noting that under Illinois law plaintiff had "an equitable interest in the corpus of the Trusts" and concluding that "it is from that equitable interest that [plaintiff] acquires standing to enforce the Trusts.").

Additionally, Plaintiffs have been deprived of a correctly funded plan (which is required by ERISA § 403) whereby sufficient assets are managed prudently and loyally to pay retirement benefits. Defendants claim that the Plan is fully funded. MTD at 7, 26. However, whether the Plan is fully funded under ERISA is a factual matter—and a complex one—that is plainly inappropriate for resolution on a motion to dismiss. Moreover, the gist of Plaintiffs' allegations on this point is not that the Plan is not correctly funded as of a certain date, but that participants are being deprived of ERISA's guarantee that the Plan is *always* correctly funded.[40]

The Complaint also satisfies the remaining elements of the Article III standing test. Plaintiffs have established causation because Defendants failed to comply with ERISA, thereby causing Plaintiffs' injuries. Finally, the relief that Plaintiffs seek (including a judgment requiring Defendants to follow ERISA's vesting requirements, fully fund the Plan, and fulfill all the duties that Defendants owe Plaintiffs under ERISA) will redress Plaintiffs' injuries. *See Lujan*, 504 U.S. at 555. Accordingly, Plaintiffs have standing to pursue their constitutional law claim.

## 2. Plaintiffs Have Adequately Pled the Merits of their Constitutional Claim.

The church plan exemption would be an unconstitutional religious accommodation as applied to the Plan. *See* Comp. ¶¶ 105-107, 213-216. The issue is both legal and factual. As to the relevant law, when government provides a regulatory exemption "exclusively to religious organizations that is not required by the Free Exercise Clause and that . . . burdens nonbeneficiaries," it has endorsed religion in violation of the Establishment Clause. *Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 15, 18 n.8 (1989) (plurality opinion).[41]

The church plan exemption would privilege Advocate for its claimed faith, even though it would: (i) not comport with any valid secular purpose for which the exemption was enacted, *contra Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309 (2000); (ii) harm Advocate workers

---

[40] Even the document cited by Defendants states the Plan was underfunded in 2012. MTD Ex. D, at 34.

[41] *See also Freedom From Religion Found., Inc. v. Lew*, 983 F. Supp. 2d 1051,1053, 1063 (W.D. Wis. 2013) (enjoining IRS from enforcing a sixty-year-old federal statute providing a tax exemption for clergy, explaining that it "violates the establishment clause . . . because [it] provides a benefit to religious persons and no one else, even though doing so is not necessary to alleviate a special burden on religious exercise"; noting that "the cases in which the Supreme Court has upheld religious accommodations are in contexts that otherwise would result in severe restrictions on free exercise.").

and put Advocate's competitors at an economic disadvantage, *contra Tex. Monthly*, 489 U.S. at 15; *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 708-09 (1985); *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005); (iii) not relieve Advocate of any religious burden created by ERISA, *contra Tex. Monthly*, 489 U.S. at 15; and (iv) create more government entanglement with alleged religious beliefs than would ERISA compliance, *contra id.* at 20. *See* Comp. ¶¶ 213-216.

Defendants largely ignore this analysis, and instead focus on the test established in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). However, the *Lemon* test does not apply to challenges to religious accommodations.[42] Nonetheless, under the focused Supreme Court accommodation cases, and even under *Lemon*, Plaintiff has adequately a violation of the Establishment Clause.

The factual allegations relevant to these factors include: (i) the Congressional purpose of avoiding examination of church books and records has no application to Advocate, as Advocate is not run by a church and already purports to disclose all material financial records and relationships when it seeks Medicare and Medicaid reimbursements and issues tax exempt bonds, Comp. ¶ 215(A); (ii) participants are damaged by being denied the protection of ERISA and competing hospital chains are put at an economic disadvantage in their competition with Advocate because, unlike Advocate, they are dutifully meeting ERISA requirements and paying PBGC premiums, *id.* ¶¶ 215(B) and (C); (iii) compliance with ERISA would not impose any genuine burden on any of Advocate's religious practices, *id.* ¶ 215(D); and (iv) although compliance with ERISA requires *zero* entanglement with religion, an exemption for Advocate requires courts and agencies to examine unilateral religious "convictions" of a non-church entity to determine if they are "shared" with a church, in the absence of any actual church responsible for the pensions. *Id.* ¶ 215(E). These factual issues cannot be resolved on a motion to dismiss.[43]

---

[42] *See, e.g., Cutter*, 544 U.S. at 717-18 (declining to apply *Lemon* in religious accommodation case); *Hosanna-Tabor*, 132 S. Ct. 694 (deciding Establishment Clause claim with no reference to *Lemon*).

[43] While a "facial" constitutional challenge may in some cases be subject only to legal issues, *see Cutter*, 544 U.S. at 725, the as-applied challenge "is not a pure question of law, but rather depends on a determination of factual matters." *MacDonald v. Grace Church Seattle*, 457 F.3d 1079, 1086 (9th Cir. 2006); *Harris v. Mex. Spec. Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (as-applied challenge "requires the development of a factual record for the court to consider."). The analysis required by the Court's accommodation cases depends on determination and weighing of factual matters.

Advocate's factual arguments regarding whether application of ERISA would impose burdens on religious exercise are improper for resolution on a motion to dismiss, and in any event, do not withstand scrutiny. For one thing, Advocate makes no argument that ERISA would burden its *own* religious exercise, but instead relies only on speculative claims about how ERISA could conceivably burden the religious practices of entities affiliated with *other churches*. MTD at 30. This argument cannot save Advocate from this *as applied* challenge. Moreover, Advocates' claim that ERISA compliance would limit the ability of other religious organizations to use "socially responsible investment criteria," MTD at 30, is legally erroneous, as nothing in ERISA prohibits the use of socially responsible investment criteria to screen investments so long as the portfolio as a whole is managed for the "exclusive" benefit of participants. *See* 29 C.F.R. § 2509.08-1 (2008). Moreover, Advocates' own Trust Agreement already requires that the Plan be maintained for the "exclusive" benefit of Plan participants. MTD Ex. M, §1.2. *See also id.* Ex. B, § 17.12. Thus, compliance with ERISA would not create any new religious burden.

Advocate's arguments with respect to same sex marriage and social investing are particularly suspect in light of the fact that Advocate also sponsors an ERISA regulated 401(k) plan. Comp. ¶¶ 81-82; *see also* MTD Ex. J, at 2. Under ERISA, same sex marriages must be recognized for the 401(k) plan, *see* DOL Technical Release 2013-04 (Sept 18, 2013), *available at* http://www.dol.gov/ebsa/newsroom/tr13-04.html; IRS Rev. Ruling 2013-17, *available at* http://www.irs.gov/pub/irs-drop/rr-13-17.pdf, and, as noted above, the "exclusive" purpose limitation on social investing applies. Thus, Advocate has already agreed to be bound by the very ERISA provisions they argue would burden religion. Ultimately discovery would be required to elucidate Advocate's supposed religious conflicts with ERISA, but based on the record already before the Court it is plain that Advocate cannot establish any such conflict now as matter of law.

## V. CONCLUSION

For these reasons, Plaintiffs urge the Court to: 1) deny the motion on the ground that the Plan, as a matter of law, is not a church plan; or in the alternative 2) deny the motion on the ground that the issues presented may not be resolved in the absence of discovery.

DATED: July 31, 2014

KELLER ROHRBACK, L.L.P.
Ron Kilgard
 rkilgard@kellerrohrback.com
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel.: (602) 248-0088
Fax: (602) 248-2822

KELLER ROHRBACK, L.L.P.

By /s/ *Erin M. Riley*
 Lynn Lincoln Sarko
  lsarko@kellerrohrback.com
 Erin M. Riley
  eriley@kellerrohrback.com
 1201 Third Avenue, Suite 3200
 Seattle, WA 98101
 Tel.: (206) 623-1900
 Fax: (206) 623-3384

COHEN MILSTEIN SELLERS
 & TOLL, PLLC

By /s/ *Karen L. Handorf*
 Karen L. Handorf
  khandorf@cohenmilstein.com
 Michelle Yau
  myau@cohenmilstein.com
 Mary Bortscheller
  mbortscheller@cohenmilstein.com
 1100 New York Avenue, N.W.
 Suite 500, West Tower
 Washington, D.C. 20005
 Tel.: (202) 408-4600
 Fax: (202) 408-4699

STEPHAN ZOURAS, LLP

By /s/ *James B. Zouras*
 James B. Zouras
  jzouras@stephanzouras.com
 Ryan F. Stephan
  rstephan@stephanzouras.com
 205 North Michigan Avenue, Suite 2560
 Chicago, IL 60601
 Tel.: (312) 233-1550
 Fax: (312) 233-1560

*Attorneys for Plaintiffs*